IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER **(202) 553-9682**, THAT IS STORED AT PREMISES CONTROLLED BY T-MOBILE | Case No. 1:24-sw-522 |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Jeremy Hoffman, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number **(202) 553-9682**, ("the **SUBJECT PHONE**"), that is stored at premises controlled by T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, in Parsippany, New Jersey. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require T-Mobile to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2.      I have been employed as a police officer with the Fairfax County Police Department ("FCPD") for over 23 years and have been duly sworn as a Task Force Officer ("TFO") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") for over two

years. I am currently assigned to the Special Investigations Unit of the FCPD and the ATF Falls Church II Field Office.

3. I have been involved in numerous investigations involving violations of federal and state firearms laws. I have received training and have experience investigating violations of both local and federal firearms laws. Additionally, I have received training and have experience in interviewing and interrogation techniques, arrest procedures, search and seizure, narcotics investigations, white collar crimes, search warrant applications, and various other crimes. In my current role as a detective with the FCPD Special Investigations Unit, I am responsible for investigations involving certain felony firearms offenses, and matters touching national security.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 922(g)(1) (possession of a firearm after being convicted of a crime punishable by more than one year imprisonment) have been committed by Samuel Lee Bucey ("**BUCEY**"). There is also probable cause to search the information described in Attachment A for evidence, of these crimes as further described in Attachment B.

## PROBABLE CAUSE

A.    Background on BUCEY

6. BUCEY has a lengthy criminal history spanning the period between 2005 and 2022 and has been convicted of multiple felonies, including firearm offenses. For instance, on or about August 16, 2013, BUCEY was sentenced to 3 years of incarceration (2 years and 6 months

2

suspended), after pleading guilty to grand larceny in the Arlington County Circuit Court. On or about August 5, 2014, **BUCEY** was ordered to serve the remaining 2 years and 6 months of his sentence after the Court revoked his supervised probation. In addition, on or about August 13, 2020, **BUCEY** was sentenced to a total term of 28 months of incarceration after pleading guilty to two counts of attempted burglary in the Superior Court of the District of Columbia. Most recently, on April 21, 2022, **BUCEY** was convicted of committing credit card theft, grand larceny, and burglary in the Fairfax Circuit Court. On May 20, 2022, he was sentenced to a total term of imprisonment of 5 years, 3 years and 364 days suspended, with credit for time served.

7. According to records from the Fairfax County Adult Detention Center, **BUCEY** was most recently released from incarceration on or about May 27, 2022.

8. Prior to the date of the instant offense, which is described in further detail below, **BUCEY** was arrested in Fairfax County, Virginia, on May 29, 2024, for breaking the windows of vehicles at a hotel in Springfield, Virginia. When he was arrested on May 29, **BUCEY** was wearing a red t-shirt with black sleeves and a white lining running across the shoulders and down the sleeves of the shirt.

B. Background on Investigation

9. On the morning of June 8, 2024, FCPD officers and detectives responded to reports of a break-in into two law enforcement vehicles parked at two different hotels in the Eastern District of Virginia.

10. Specifically, two marked police cruisers belonging to the Alachua County Sheriff's Office (which is located in Gainesville, Florida), were parked overnight at two hotels— the Courtyard Marriott hotel, located at 6710 Commerce Street, and the Hilton hotel, located at 6550 Loisdale Road, both in Springfield, Virginia, which is within the Eastern District of

3

Virginia. The hotels are located approximately half a mile from each other. Each of the cruisers (hereinafter referred to as "CRUISER 1" and "CRUISER 2") was forcefully broken into in the early morning hours of June 8. From CRUISER 1, which was parked at the Courtyard Marriott, law enforcement equipment was stolen, including one Colt M4 .223 caliber semi-automatic rifle with a 12-inch barrel bearing serial number LE145493 (hereinafter, the "RIFLE"),[1] as well as handgun and rifle magazines. The owner of CRUISER 1 reported that the RIFLE was inside a black rifle bag and the magazines were stored inside a law enforcement tactical vest. From CRUISER 2, which was parked at the Hilton, additional law enforcement equipment was stolen, including an otherwise empty rifle bag containing .223 caliber ammunition.

11. Responding FCPD officers obtained and reviewed surveillance footage from the Hilton, which showed that at approximately 2:40 a.m. on June 8, 2024, a subject rode what appeared to be a rental bicycle through the Hilton's parking lot. The subject rode the bicycle through and around the law enforcement vehicles that were parked there, including CRUISER 2. The subject appeared to be a black male in his late 20s or 30s with a beard and wearing a baseball cap and a shirt with a white stripe going down the shoulders. In the video, the face of the subject was visible.

12. The surveillance video further showed the same subject returning to the Hilton parking lot at approximately 4:10 a.m. In the video, the subject can be seen walking around and between the law enforcement vehicles that were parked there, including CRUISER 2, and

---

[1] Based on my training and experience, I know that Colt firearms are not manufactured in Virginia. Having interviewed the Alachua County Sheriff's Office officers whose cruisers were broken into, there is probable cause to believe that the RIFLE is a "weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(1)(3)(A).

shining a flashlight inside CRUISER 2. At approximately 4:20 a.m., the subject can be seen breaking one of CRUISER 2's windows and carrying away objects from inside the vehicle.

13. FCPD officers on scene sent a screenshot of the subject's face as captured by the surveillance video to other FCPD officers who were known to patrol the area surrounding the hotels. One of the officers recognized the subject as **BUCEY** based on previous interactions the officer had had with him. **BUCEY**, a black male in his late 30s who has a beard, matched the description of the subject seen on the Hilton surveillance video.

14. Responding FCPD officers also canvassed the areas surrounding each of the hotels. At the Courtyard Marriott, officers located a dumpster in the parking lot where CRUISER 1 was parked. Inside the dumpster, officers found law enforcement equipment that had been taken from CRUISER 1, including the law enforcement tactical vest, although the magazines that had been stored in it were missing. At the Hilton, officers located a fenced utility area containing a tank in the parking lot where CRUISER 2 was parked. Inside the fenced utility area, officers found law enforcement equipment that had been taken from CRUISER 2, including the empty rifle bag, although the ammunition that had been inside the bag was also missing.

15. Law enforcement officers also obtained surveillance footage from the Metro Transit Police Department ("Metro Transit") that showed **BUCEY** arriving at the Franconia Springfield Metro Station, which is approximately one mile and a half from the Courtyard Marriott and Hilton hotels, at approximately 5:42 a.m. In the Metro Transit surveillance video, **BUCEY** can be seen with a Capital Bikeshare bicycle holding a black rifle bag identical to the one containing the RIFLE that had been stolen from CRUISER 1. The surveillance video shows **BUCEY** boarding a Metro railcar train at 6:50 a.m., shortly after the station opened. Additional surveillance footage obtained from Metro Transit showed **BUCEY** exiting the Metro railcar train

5

at the Minnesota Avenue Station, in Washington, D.C., at approximately 8:03 a.m.  In the video, **BUCEY** can be seen still carrying the black rifle bag.

16. Based on the aforementioned information, on June 8, 2024, FCPD obtained state arrest warrants charging **BUCEY** with numerous offenses, including the theft of the RIFLE. **BUCEY** was arrested that afternoon in the District of Columbia and has since been detained in relation to those local charges.  While in custody, FCPD detectives interviewed **BUCEY** after he waived his Miranda rights.  During the interview, an FCPD detective explained the charges filed against **BUCEY** and told **BUCEY** that law enforcement needed the RIFLE back.  In response, **BUCEY** stated, "How would I do that?"  An interviewing detective asked **BUCEY** if the RIFLE was at his mother's house, to which **BUCEY** responded, "No, it's not there."  **BUCEY** went on to say that he could call someone about getting the RIFLE back.  **BUCEY** then agreed to place a recorded phone call in the presence of law enforcement from his cell phone to the subject to whom he sold the RIFLE.  During the phone call, **BUCEY** told the subject on the phone that he needed the RIFLE back.  The subject referred to **BUCEY** as "Six."  **BUCEY** was cooperative with the detectives in trying to locate the RIFLE and get it back, but ultimately the RIFLE was not recovered.

17. When **BUCEY** was arrested on June 8, 2024, his cell phone was seized incident to the arrest.  FCPD obtained a state search warrant and searched **BUCEY**'s cell phone, which has the phone number **(202) 553-9682** (i.e., the **SUBJECT PHONE**).  A review of the cell phone extraction revealed that on the morning of June 8, 2024, **BUCEY** sent a text message to one of his contacts reading: "This Six I got something for you.  Chopper [gun emoji] [gun emoji] machine gun pressure $1000."  Based on my training and experience, I know that the term "chopper" is slang used to refer to a machine gun.

6

18.     From my training and experience, I know that it is common for individuals to carry their cell phones on their person or within close proximity at most times.  Indeed, **BUCEY** was carrying his cell phone at the time of his arrest, less than 12 hours after CRUISER 1 and CRUISER 2 were broken into.  Moreover, after the break-ins and prior to his arrest, **BUCEY** used his cell phone to send a text message to one of his contacts attempting to sell a firearm, which I submit was the RIFLE.  Based on the prominent ownership and usage of cellular devices in current society, and in light of **BUCEY**'s use of the **SUBJECT PHONE** within hours of the offense committed, it is likely that **BUCEY** brought the **SUBJECT PHONE** to the scene of the offense and the **SUBJECT PHONE** was using and/or registering with the cellular site or tower providing service to the cellular device in the general geographic area of the crimes.  Therefore, there is probable cause to believe that the **SUBJECT PHONE**, which is serviced by T-Mobile, contains location evidence of **BUCEY**'s involvement in the offense.

## BACKGROUND ON PHONE PROVIDERS AND RECORDS

19.     Based on my training and experience, I know that each cellular device is identified by one or more unique identifiers. For example, with respect to a cellular phone, the phone will be assigned both a unique telephone number but also one or more other identifiers such as an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The types if identifiers assigned to a given cellular device are dependent on the device and the cellular network on which it operates.

20. Further based on my training and experience, I have learned that, in order to provide cellular communications service to the general public, many cellular service providers maintain antenna sites or towers ("cell towers") that serve and provide cellular service to devices that are within range of the tower's signals. Each cell tower receives signals from wireless devices, such as cellular phones, in its general vicinity. By communicating with a cell tower, a wireless device can transmit and receive communications, such as phone calls, text messages, and other data. When sending or receiving communications, a cellular device does not always utilize the cell tower that is closest to it.

21. Based on my training and experience, I further know that cellular providers, such as T-Mobile, routinely and in their regular course of business maintain historical records that allow them to determine which wireless devices used cellular towers on the cellular provider's network to send or receive communications. For each communication sent or received via the wireless provider's network, these records may include: (1) the telephone call number and unique identifiers of the wireless device that connected to the provider's cellular tower and sent or received the communication ("the locally served wireless device"); (2) the cellular tower(s) on the provider's network, as well as the "sector" (i.e., face of the tower), the estimated distance from the tower and sector that the cellular device was located; and the estimated latitude and longitude of the cellular device to which the locally served wireless device connected when sending or receiving the communication; and (3) the date, time, and duration of the communication. The aforementioned location information is often contained within Timing Advance data, also known as True Call, NELOS, Location Database of Record ("LOCDBOR"), or Real-Time Tool ("RTT"). These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a

wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

22.     Based on my training and experience, I know that T-Mobile can collect cell-site data about the **SUBJECT PHONE**.  I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

23.     Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service.  I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **SUBJECT PHONE**'s user or users and may assist in the identification of co-conspirators and/or victims.

24.     Based on my training and experience, I know that a person who is involved in criminal activity often uses electronic devices, including but not limited to cellular telephones, to aid in their criminal activities. In particular, I know, based on my training and experience, that

9

suspects frequently use cellular telephones to communicate with each other prior to, during and/or after the commission of a crime. The information obtained from this cellphone usage can be of significant assistance to the investigation and evidence in a subsequent criminal prosecution by showing the communication records/pattern(s) between any possible suspect and co-conspirators. Location information and call detail records generated by the use of cell phones can indicate the general geographic area that the mobile device was located at, as well as provide investigative leads of whether witnesses or suspects communicated with anyone prior to, during and/or after a criminal event, which can associate the cellular phone/device to a specific suspect or individual.

25. Additionally, I know, based on my training and experience, that acquiring an extended period of call detail records can assist in establishing a pattern of life, or use, of a target telephone. Longer periods of records outside the immediate date/time frame of the underlying crime can assist investigators in establishing calling patterns of the target phone (here, the **SUBJECT PHONE**) and prevalent cell sectors it has used. The establishment of this pattern of life, or use, is critical in helping investigators determine if, and when, this calling pattern changes, intensifies, or wanes during relevant time periods within the investigation. These changes in the pattern of life can also assist investigators in identifying any co-conspirator(s) who may have provided aid or counsel during the relevant time period surrounding the conception, planning, commission and/or cover-up of the criminal activity.

## **AUTHORIZATION REQUEST**

26.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

27.     I further request that the Court direct T-Mobile to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on T-Mobile, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

*Jeremy Hoffman*

Jeremy Hoffman
Task Force Officer
Bureau of Alcohol, Tobacco, Firearms and Explosives

Subscribed and sworn to in accordance with Fed. R. Crim. P. 4.1 by telephone on July 24, 2024.

The Honorable William B. Porter
UNITED STATES MAGISTRATE JUDGE

11

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number **(202) 553-9682** ("the Account"), that are stored at premises controlled by **T-Mobile** ("the Provider"), headquartered at **4 Sylvan Way, in Parsippany, New Jersey.**

**ATTACHMENT B**

**Particular Things to be Seized**

I. **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period between **June 7, 2024 and June 9, 2024**.

    a. The following information about the customers or subscribers of the Account:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

    b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

        i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

        ii. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received, as well as any per-call measurement data (also known as the "real-time tool" or "RTT" data).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. § 922(g)(1) involving SAMUEL LEE BUCEY on or about June 8, 2024, including but not limited to information about the location of the Account described in Attachment A, which includes all available data regarding the cell tower and sector through which communications were sent and received, as well as any per-call measurement data (also known as the "real-time tool" or "RTT" data), latitude-longitude data, or other location information available.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.